Yes, please proceed. There is another case in the argument calendar. Thank you. Thank you, Governor. The next case is number 09-1121, Catch Curve, Incorporated v. Venali, Incorporated. Mr. Sachs. Thank you, Your Honors. May it please the Court, Robert Sachs from Sullivan and Cromwell for the appellant, Catch Curve, Inc. I'd like to reserve five minutes of my time for rebuttal, if that would be possible. Just briefly, this appeal involves several patents that involve a fax communication system, which essentially works as follows. A fax is sent out over the public switch telephone network to what is called a store-and-forward facility, which is basically one or a series of computers which digitize the faxed information they receive, perform a number of functions, and then either send the fax out to an ultimate recipient or store the fax within the SAF. With respect to these mailbox claims, I understand your point that the District Court may have erred in construing facsimile message the way it did. But suppose we were to construe either the term mailbox or the term facsimile message to require the capability of the mailbox to send the message to a fax machine using a facsimile protocol. Let's just hypothetically assume that that were the construction that were adopted. Then Venali would not infringe, correct? No, Your Honor, that's not correct. Why is that not correct? Because any—well, we're dealing with infringement, obviously. You're asking infringement, not a construction question. But any digital stored information can be converted and sent by fax protocol. Well, that's true, but if I understand the record correctly, if you look at 3355, my understanding in paragraph 7 there is it says— Do you have the appendix? I'm looking for it, Your Honor. Sorry. 3355? Yes. I have it. I have it. Well, the second sentence of paragraph 7 says that the Venali-accused services are neither coupled to the switched telephone network to transmit messages nor configured to be capable of transmitting messages using facsimile protocol. I understand, Your Honor. Well, first of all, on the storage claims, that is not a requirement of any of the five storage claims. No, no, I understand that, but that wasn't my hypothetical. My hypothetical, and I know you don't like it, is that we construe these mailbox claims, the storage claims, as including a requirement that there's a capability to send the message to a fax machine using a facsimile protocol. If we adopted that claim construction, my question is, does Venali infringe? I believe that their present system does not—it is something they could easily implement, but in their current system, they do not send by fax protocol. That's correct. So it would not infringe under that construction? That's correct. Okay. Going back, though, Your Honor, to the fundamental— But then to come back to the claim construction, why shouldn't the mailbox claims be construed to require that they have the capability to send the message to a fax machine? Well, there are two different reasons for that, Your Honor, and I will address them in turn. First of all, the Court erred fundamentally in its definition of fax, and so it depends what—if that definition is incorrect, then they do have the capability of sending to a fax machine because the limitation of fax protocol on the outbound delivery would not be part of the definition of a fax, and the fundamental mistake the Court made was to define— I'm not sure that you're addressing my question about why— that the mailbox, the storage facility, have the capability of sending the message by fax protocol to a fax machine, not that it doesn't, but that it has the capability. So why is that wrong? The preferred embodiment shows that, number one, not necessarily the full limits of the scope of the invention. That's number one, and that gets back to the wrong definition of fax used by the Court below. But number two is you can clearly claim parts of an invention, not the whole invention. These patents, in fact, in the specification indicate that subsets of the claim system would make a commercially viable system, so you're not required to claim all aspects of it, and those claims do not claim the function of delivery. And I think the best place to start, Your Honor, is let's look at the claims, because if you look at the claims, you'll understand why, and I have an illustrative claim here which explains exactly why that's not a proper reading. And so I'm looking for A72. I'm reading from Claim 44, which is one of the storage claims that has been asserted in this particular case. If you read Claim 44, the elements of the claim first include sending from. The outbound means that it has to go out over the PSTN, so it has to be a fax. Now, a fax is defined by what is sent, not by what somebody does with what is sent. So a fax has to go out over the PSTN and is received by the store and forward facility. It's then manipulated. If you see Claim 44, it does not claim the function in Claim 44 of receipt. But if you go down, because there are a number of dependent claims here. First, 44 captures 46, which is not relevant to this discussion. But then you go down to Claim 49. 49 has the method of 46, wherein the forwarding step includes the delivery employing digital communications. So, again, that gets back to the fundamental misconception that the Court made in defining fax as requiring transmission at all stages through fax protocol. And, by the way, fax protocol is a transmission methodology. It's not a storage methodology. This is an issue that the parties never seem to really come to any resolution of, and I suspect we won't hear it today. But is there anything about fax protocol that specifically limits it to analog as opposed to digital? At that point in time, fax protocol, faxes, the customary way of sending faxes in the late 80s was analog. There are today fax protocols that are digital. That's correct, Your Honor. And it was known at the time as well that communications could be sent digitally. Indeed, in the prosecution history, the Crager reference, which is one of the references that is actually cited for some reason against us, the inventors actually, which was a packet switch network, it's exactly how Internet transmissions go. It's exactly how Vanalli sends their information from the SAF to their customer. It says that the packet switch network could be used as a method of communication between the computers that comprise the SAF. So it was known in the art at the time, although the commercially available systems were systems that used analog fax protocol. In many ways, it's like the SuperGuide case, which this Court has decided, which dealt with the way that customary television signals, at the point in time they were analog, but it was known in the art that video could be communicated digitally. And even though televisions didn't have that at that point in time, it was known in the art that that could be something. Here it was known that there could be digital image communication as well, though that was not the particular issue at that point in time, because it was not the customary system at that point. But let me just address Judge Dyke's issue here by going through, if I could, these claims, because I think it's important to look at the claim methodology, the way the claims are structured. If you go down to Claim 52, it says, The method of Claim 46, again going up, wherein the second store and forward facility attempts delivery of the facsimile message to a fax device over the switched telephone network, making clear that that is an additional function, it is a dependent claim, and therefore if you were to construe the storage claim as including that function as part of it, it would render Claim 52 meaningless, in violation of fundamental principles. Well, I'm not sure. That's talking about where the attempt is made to send it over the switched telephone network. Well, that's defining the delivery function. So if you look at the claim, Claim 44 defines the elements of the invention that require receipt of a fax handling of the fax, and storage of the fax. And then you go on and there are other features of the invention which are dependent and additive to that. And one of those is at Claim 52, which is the feature of ultimate delivery. And that's just one example of that. There are many. But I don't see that 52 is inconsistent with the notion that the earlier claims have the capability to send to a fax machine. This is just talking about a method which includes the step of trying to send it to a fax machine. But the capability of sending is not part of the portion of that invention that is being claimed in Number 44. Well, that's the question, is whether that capability is part of the mailbox claims or not. But then you're reading into that claim, essentially, whether you perform it or not, the requirement that you be able to perform a feature and function of the overall invention that's not claimed in that portion of it. That's a good way of stating it. That's the question of whether that's what would be done there, or whether it's really interpreting the claim to include a feature which is described in the specification. But again, all claims don't have to have all features, and it would be improper to read into claims that claim a subset of features, all of the features of the patented invention. But doesn't the description in the specification of the mailbox feature include a description of sending it to a fax machine? For example, if you look at column 67, I mean page 67, column 15, lines 23 to 25, that seems to contemplate, it says by use of the redirection feature, messages sent to the fax mailbox can be accessed by an individual with a security code from any telephone with a fax machine. It seems to describe a capability of having the thing sent from the mailbox. That's undoubtedly a capability of the system that's disclosed, but in order to infringe this claim, they can't avoid infringement by not including that additional feature. Well, is there anything in the specification that suggests that the mailbox could send the message by some other method besides a fax protocol? Absolutely. I think that, first of all, the specification talks about that it's typical in this way, but the specification talks specifically about communications being digitized, and the way every claim is set up, Your Honor, is that the communication from the originating communication has to be a fax protocol communication, but once it hits the SAF, it no longer has to be in fax protocol. I understand that, but I understand your point about communications between SAFs not using the fax protocol, and that seems to be correct. The problem is that it appears that the mailbox feature must have the capability of sending to a fax machine, and that's the problem that I see. What I'm asking you, is there something in the specification that suggests that the mailbox can send by email or something else other than to a fax machine? Email, obviously, was not a method of communication at that point in time, but I think the specification does not specify the method of communication, so it indicates, given the nature of this being something being sent from a computer, which is digitized, when it's in the computer and stored in a computer, that recognized methods of sending information could be accepted and could satisfy that claim element, even though the specific issue being addressed at that point in time was something that would have typically, as the patent says, it says typically, not exclusively, would have been communicated by fax protocol. If I could reserve my very brief remaining time for rebuttal, I would appreciate it. We will save you enough rebuttal time, Mr. Sachs. Thank you, Your Honor. Mr. Carey. Good morning, and may it please the Court. To pick up on the question from Judge Dyke about the mailbox claims, the claims explicitly require the capability of sending the fax message to a receiving fax machine, for two reasons, at least. One is the description of mailbox in the specification. I don't know. Explicitly, you've got a hard time on explicitly. Your Honor, the reason I say that is because every one of these mailbox claims requires, early on in the claim, the presence of a store and forward facility. Store and forward facility requires forwarding the fax message, the capability of forwarding the fax message to a recipient fax machine. Or to any other recipient. I'm sorry, Your Honor? Or to any other. As far as the storage facility is concerned, the theory is that's not particularly limited by the next step of what the recipient is, is it? Well, the storage, what they call the storage claims, and that's kind of a misnomer because they're not just storage claims. The presence of this claim limitation, in every one of these particular claims, for a store and forward facility. A store and forward facility isn't just a storage facility. It's a store and forward facility. It's got to have the capability of forwarding to a VFX protocol, forwarding that fax message. Whether or not the claims end up requiring the actual delivery, the exercise of that capability, is beside the point for these claims. Judge Dyke's question was, do the claims require the capability be in the system in order for there to be infringement? And the claim limitation in all of these claims requiring the presence of a store and forward facility clearly does require that there be a store and forward facility in order for there to be infringement. What is a store and forward facility? It is a facility that stores and can forward. And Vinali's system, it's conceded, does not have the capability of forwarding as construed. Well, wait a minute. Suppose you have a system, which I think is in fact both the, in a general way, both the claim system and at least in some manifestations I understand Vinali's system, in which you have the originating fax, then you have a store and forward facility and a second store and forward facility, it's certainly in the claims, and then ultimately a recipient fax. First question, is there anything in your view that requires that the communication between SAF I and SAF II be done in fax protocol? Yes, Your Honor. You think that it does? Yes. So you disagree with the point that, the observation of Judge Dyke, that did not seem to be required in the patent? I do disagree with that particular interpretation, yes. And where do you get that from the patent, that SAF I to SAF II communication has to be in fax protocol? Because the only description in the patent about having two SAFs is connecting the two SAFs between long-distance trunk lines. So you think that the communication has to be number one on long-distance trunk lines and number two in SAF protocol? I mean, presumably you could say that the internet can go over long-distance trunk lines as we all know from years ago using 56k, right? So there's nothing new magic to the long-distance trunk lines, right? There's no... I mean, it doesn't dictate that this be fax protocol. They could have used another type of protocol. Sure. They only claimed this one. And used trunk lines, long-distance trunk lines. Correct. So you didn't get any mileage out of the trunk lines. So what is it, setting aside the trunk lines, what is it that tells us that the SAF I to SAF II has to be in fax protocol? Because what is the SAF? The SAF is defined as a proxy fax machine. That's the definition of it in the specification. That's the entire description of it in the specification. It is a proxy fax machine. And they locate the multiple SAFs to take advantage of long-distance charges, etc. The first SAF is situated geographically proximate to the originating fax machine. And ideally, SAF II is described as being geographically situated near the recipient, close to the intended recipient machine. Therefore, there are reduced long-distance charges because of the use of the multiple SAFs. The SAF is a proxy fax machine. It has to be able to send out a fax. If it can't, it's not a SAF. What's your best evidence from the text of the patent that the SAF has to, point me to somewhere in the patent that you say there. That's where it establishes that the SAF has to be, SAF I in this case, has to be both receiving in fax protocol and sending in fax protocol. Well, Your Honor, what I just described. Rather than in packet switch form, right? There's, well, there's nothing in here at all about packet switch networks in this description. You mean in the patent? Correct. But there is in the prosecution history. Yes, it was distinguished as being completely different from the subject matter of this invention. I didn't read it that way. I read the prosecution history Mr. Sachs referred to as suggesting that, in fact, Cragar was similar to the invention with respect to the capacity to use packet switching. We're at page 1311 to 1312. Turning out of consideration of Cragar, Cragar discloses a form of packet switch digital data network. The switch data network of Cragar is admittedly one form of switch network that could be utilized to move the fax messages of the present invention from one SAF to another. That sounds like they're saying the present invention is broad enough to allow the use of packet switched network, right? Well, it seems like they're trying to argue that here in the specification, though. There was no disclosure of that. I don't understand that. There's no disclosure of the use of any packet switch network in the specification. What do you understand this sentence to say? I'll tell you what I understand it to say, and then you tell me why my understanding is wrong, if you think it's wrong. I understand it to say we're not going to distinguish Cragar on the ground that Cragar uses package switching. All right? Yes. Is that your understanding as well? I think they're drawing different distinctions on it. Correct. Yeah, okay. So they are saying, in effect, this is something that's within the scope of our invention. Right? Well... Packet switch digital communication, which would be... And now my next question... Well, go ahead. Answer. I'm sorry. I don't... What they may have argued... What we could infer that they thought in this to be within the scope of the invention. They're distinguishing Cragar on alternative ground. They are. They choose not to distinguish Cragar on this ground. That's correct. Because, in effect, they're saying we can't distinguish Cragar on this, they say, admittedly, because this is us. They're saying that packet switch is a type of switch network. Well... And they're drawing other distinctions on it. Correct. All right. I don't think that means that the invention necessarily includes a packet switch network. They still have to have a specification to need to support that construction, as would claim language, which I don't believe it does. Now, your view is that the FACTS protocol can be either analog or digital, as I understand it. There's nothing specifically analog about FACTS protocol as you understand the term and as you believe the term was used in the patent application in 1988, correct? That's right, Your Honor. I think this digital analog distinction that's being advanced here on appeal is a red herring. It's completely beside the point. But I take it that you take a different position with respect to the packet switched. Once you are into packet switching, you're no longer in FACTS protocol. You can't have FACTS protocol that's packet switched. Is that correct? Is that your position? I believe that the technology changed after the time these patents were filed. The FACTS protocol that is important here is the format of the document and the communications protocol that's used to send it as disclosed in the patent over the circuit switched telephone network. Which would be circuit switched and not packet switched. Yes. So if the word packet switched showed up, you'd say that's outside of the scope of the patent as you view the scope of this patent, correct? I would. But if I happen to be wrong about that, it wouldn't change the infringement result. Because the transmission, even if you brought in packet switched networks to these claims, there's still no transmission in the Venali system of a FACTS protocol for the document format or for the communications protocol itself. Our messages are sent via protocols known as XML and SMTP, which is simple mail transfer protocol, which is a type of email protocol. There's no dispute that those transmission protocols are not FACTS protocols. Completely irrespective of whether you bring in packet switched networks as the highway for them. So that also is a little bit, it's an interesting point. I think the court correctly limited the claims to the circuit switched network because that is the very character of this invention. But you say you don't need that limitation. It's not, that point is not essential to the holding of non-infringement. I understand your point. Thank you. But you would then still have to convince us that the mailbox claims require the capability of sending to a FACTS machine using a FACTS protocol. Whatever transmissions may take place from one staff to another, assuming that they don't use a FACTS protocol, as I think Judge Bryson has been pointing out, the claims seem to cover situations in which some of the transmissions are not by FACTS protocol. If I understand what you're saying, is that the incoming, everybody agrees that the incoming has to be by FACTS protocol. And your argument is even though there may be transmissions as part of the system which don't involve FACTS protocol, that the final ability to transmit by FACTS protocol to a FACTS machine has to be part of the storage capability. That is correct, Your Honor. And so, as the court below found, we don't infringe these so-called storage claims for two reasons. One is we don't have a SAF. In other words, we don't have a store and forward facility, which is a structure that has the capability of forwarding, not just storing. We don't have that. We also don't infringe the mailbox claims because we don't have the FACTS message that's construed. Well, but I'm confused now because I think what I was suggesting to you is that the district court's construction of FACTS simile message probably was incorrect because something remains of FACTS simile message under the claims, even when it's not transmitted by FACTS protocol from one SAF to another, for example. Right? I don't believe the court said that, Your Honor. I think FACTS message is defined consistently throughout here and exclusively. Well, Andre, let's assume you're incorrect about that, that the district court's construction is not correct. Does the specification support construing the term mailbox or whatever to require the capability of ultimately sending the message to a FACTS machine using a FACTS protocol? Yes, it requires that. In addition to the Column 15 reference that was mentioned, at Column 14 of the 021 patent, for example, is a description of the mailbox. And the mailboxes are described as having information about the destination. Which line are you in? I'm at Column 14, starting at about the paragraph beginning at line 32 through 27. This description of mailboxes. You're in the 021 patent or which patent are you in? This is the 021, Your Honor. Okay. And so this description of the mailbox function indicates that the mailbox has information with the destination FACTS machine number to which the messages will normally be sent. And, of course, the user can call in and change the number if they're at a hotel and change the number. But the mailbox is configured in here to send the message on to the destination FACTS machine. I guess their point about that is that this is the description of the preferred embodiment and that that may be true of this described embodiment, but it isn't necessarily true of all the embodiments covered by the claims. I believe that there is no embodiment in here in which the mailbox doesn't end up transferring the message to the user to a FACTS machine using a FACTS protocol. Now, just to be clear, when we're using the term FACTS machine, I think there was at least a little, at least I was a little unclear in Mr. Sachs' argument. I think he was using the term FACTS machine a little more broadly than you are. You're using FACTS machine in the context of this patent to mean, I take it, a conventional FACTS machine that answers the telephone and takes the signal off the PTSN and converts it into a visible image, not a computer that uses a different protocol or a television set or voicemail or anything else that just happens to receive an image which looks a lot like the image that was originally sent, right? I don't disagree that a computer, as the specification discloses, that is the computer that is configured with software in a modem to emulate a FACTS terminal can qualify as a, quote, FACTS machine. I do not disagree with that. I don't think that has any bearing on the outcome of anything in this case. So you think that a computer that gets an image through some conveyance of, after conversion, into a different protocol would be a FACTS machine? No, Your Honor, that's not what I said. I said a computer that is set up to be a FACTS machine. If you load the software that the FACTS machines use and have the modem and that computer uses FACTS protocol to receive, then that's a FACTS machine too. When you just said conventional, I was imagining a set-top sort of FACTS machine device. A device that receives, is configured to receive a message via FACTS protocol and can transmit that message is a FACTS machine under this patent. The last point I would mention here on store-and-forward facilities is that store-and-forward facility was construed to be a means-plus-function limitation. And the appellants do not challenge that claim construction on appeal. Means-plus-function limitations are construed to cover the corresponding structure disclosed in the specification and nothing more. And equivalence thereof, according to the statute. And equivalence thereof, correct. So whether in this application one might say that the digital is equivalent of the analog crosses a large hurdle for this patentee, does it not? That would be one hurdle for them. The other hurdle for them would be that the only structures identified in the specification to be the store-and-forward facility components are FACTS protocol structures. Did you make this 112.6 argument in your brief? I don't recall. We made it in the claim construction. It's part of the court's claim construction order. They didn't challenge it on appeal. And so the fact that the court construed the SAF to be a means-plus-function term was not an issue that they raised in their brief. I'm just pointing out that the SAF limitations, which are in, for example, these so-called storage claims, the means-plus-function terms, they only cover the structures disclosed in this fact. Those structures are certainly not structures for sending e-mails. They're structures for sending faxes. Okay. Any more questions? I would respectfully urge the court to affirm the district court's judgment of non-infringement. Thank you, Your Honor. Thank you, Mr. Carey. Mr. Sachs, full rebuttal time. We've run over. Thank you, Your Honor. I will try to be brief and just hit the points. First of all, the issue of fax protocol. The term fax protocol appears precisely once in all five of these patents. It appears in Claim 69 of the 021 patent. Nowhere else. And so what we are talking about here is a construction that has limited the full scope of five claims based upon the existence of a protocol that is nowhere referenced in the specification, nowhere referenced in any of the claims of any of the patents except one claim of the very last patent to be issued. And so the idea that that is the sine qua non of these patents is not supported by the language of the patents, the language of the claims, the language of the specifications, or the prosecution history. But it has a lot to do with the meaning of the term fax message.  However, the ordinary use of a fax message is something that is sent in a certain way. If I print out something and give it to you that was sent originally by fax, I give it to you and call it a fax. If you look at it on your computer screen and it was sent to you by fax, you call it a fax. Finale delivers it by email to its customers, but it was sent originally by somebody else by fax. Using fax protocol, they call it delivery of a fax. So it is not the format in which the message is maintained throughout its course of travel that matters to what it is. It's what it is when it's sent. If you send a letter, it's a letter even if it's printed, copied, read to you, put in a FedEx envelope, or otherwise delivered by hand, it's still a letter. The same thing with a fax. It's how it's sent that defines what it is. If you take what it is as the definition here, it reads perfectly with all of the claims. It makes the distinction between how it is sent to the storage and forward facility to not having the limitation on the way in which somebody might take a fax that is sent to the store and forward facility and deliver it to the ultimate recipient. Delivery is not the same as what this is. To be clear about this, if I understand correctly, the kind of technology that is used by Finale simply did not exist at the time that this patent application was created. Some did, some didn't. The delivery by email did not exist at that point in time, but a packet switch network existed. But the capability of delivering this by email did not exist. We didn't have email back then, but I don't think anything in the patent precludes the ultimate delivery by a different method. And again, go back to this... But it does suggest that they couldn't very well have contemplated delivery by a different method at that time. Well, no. It could be that they didn't contemplate specifically delivery by email, but clearly they could have contemplated delivery through digital transmission means. They talk in the patent about digital transmission. They talk in the prosecution history, when you talk about Crager, of a packet switch network, which is ultimately how email generally is sent, as being a method of communication. So there's nothing in the prosecution history or the language of these claims that precludes its application to a technology that has its root in known technologies at that time. And so, while the specific delivery by email may not have been contemplated, clearly delivery through a method other than through analog fax protocol could have. With respect to digital fax protocol, clearly there are digital fax protocols. One could reasonably have presumed advances in technology that would have included digital fax protocols that might have included faster methods of transmission. Email is just one of them, and that is, again, on the back end. But the fundamental invention here, Your Honor, is the same. Somebody is sending to a Vinali subscriber a fax. They are not sending an email. They send a fax. Vinali's staff gets that fax exactly the same way in the invention. It couples and receives something received and sent by fax protocol. It then puts it into computer storage. It's exactly what the invention says. The thing they do differently is they convert it into TIFF or PDF and they spit it out to their customer by email, rather than spit it out to their customer through a standard fax communication. That is the sole difference we're talking about,  With the exception, I would say, of certain claims which do specifically require that the outbound transmission be by fax protocol. That's another issue here. If you look through the claims here, there are specific claims that do specifically claim the transmission to the ultimate recipient be by over-the-packet-switch telephone network. That seems to suggest that the other claims that don't contain that, I realize it's not dispositive, but it suggests that the other claims that don't contain that limitation don't require that, particularly in the context of claims which do specifically contain that limitation for the originating transmission from the fax machine to the staff. With that, thank you very much. Are there no other questions? Thank you, Mr. Sachs. Mr. Kerry, the case is taken under submission.